IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2004 Session

## STATE OF TENNESSEE v. LARRY ARNELL ADAMS

**Direct Appeal from the Criminal Court for Knox County**
**Nos. 70670 and 75581      Richard R. Baumgartner, Judge**

————————————————

**No. E2002-03046-CCA-R3-CD - Filed June 30, 2004**

————————————————

The appellant, Larry Arnell Adams, was convicted by a jury in the Knox County Criminal Court of one count of especially aggravated kidnapping, one count of aggravated spousal rape, one count of assault, and two counts of rape.  He received a total effective sentence of thirty-seven years incarceration in the Tennessee Department of Correction.  On appeal, the appellant raises numerous issues for our review, including consolidation and sufficiency.  Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

Norma McGee Ogle, J., delivered the opinion of the court, in which Gary R. Wade, P.J., and Alan E. Glenn, J., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Larry Arnell Adams.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and G. Scott Green and Leland Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

The appellant was charged with the kidnapping and rape of three women, BJ, MH, and JJ.[1] Prior to trial, the trial court permitted the State to consolidate the offenses against the three victims for trial, and overruled the appellant's motion to sever the cases.  The cases proceeded to trial on September 9, 2002.

————————————————

[1] It is the policy of this court to not reveal the names of victims of sexual offenses.

BJ was the first witness to testify at trial. At the time of trial, she was forty-three years old and lived in east Knoxville. At approximately 9:00 p.m. on May 11, 2000, BJ went to a Conoco convenience store at the corner of Magnolia Avenue and Spruce Street to purchase cigarettes. She took with her only enough money to make the purchase. Unfortunately, the price of cigarettes had increased, so BJ had to leave the store to obtain the additional money.

As BJ was walking home, an older model "grayish blue" car pulled up beside her. The driver, later identified as the appellant, began mumbling something. BJ approached the car to determine what the appellant was saying. Thereupon, the appellant, holding a gun in his right hand, ordered her to "[g]et in the car, bitch." BJ testified that the appellant made her climb over him to get into the front passenger seat. When BJ began inquiring as to what was happening, the appellant told her, "Shut the f**k up." During the entire encounter, the appellant continued to use profanity.

After BJ was in the vehicle, the appellant drove onto the interstate, traveling toward west Knoxville. BJ related that the appellant drove "[f]ast, in and out of lanes, just drivin' crazy, just in and out of lanes, in front of cars, just goin' crazy." The appellant "was sayin' something about his wife did him wrong by spendin' all this money and something. And he just kept – just the whole – the whole conversation was about his wife." The appellant exited the interstate at Papermill Drive and crossed Kingston Pike onto Northshore Drive. During the drive, the appellant pulled a cloth over BJ's eyes and told her, "We're gonna have wild, crazy sex 'cause I'm sick of my mother f**king wife doin' me this way, and the best way to do it is to take it out on you." BJ testified that she was frightened.

Eventually, the appellant parked the car at a house and came around to the passenger side to let BJ out of the car. He cautioned BJ to be quiet and act as if she were his girlfriend because his neighbors were outside. At this time, the appellant still had the gun. Using a key, the appellant unlocked the door to the house, and relocked the door with the key once they were inside. He then placed the key in his pants pocket. He instructed BJ to "[g]et naked, bitch." As BJ was trying to undress, the appellant showed her the gun. BJ immediately removed her clothes.

While BJ sat naked on a love seat, the appellant cooked for himself. Afterward, the appellant took BJ to a back room that had pink walls and was furnished with a four poster bed. The appellant again stated that they were going to have "wild, kinky sex." BJ testified that the appellant "made me have vagina sex first." BJ specifically stated that she did not consent to any type of sex with the appellant and never took money from him for sex. BJ testified that when she protested, the appellant "started smacking me around." He then pulled out some of her hair, including a glued-in "weave," leaving a bald spot on her head. Additionally, the appellant beat her in the ribs and back.

Later in the evening, the appellant used neckties to tie BJ to the bed and penetrated her mouth with his penis. The appellant told BJ, "'My wife, the ole bitch – she done did me so wrong; I'm gonna take it out on you.' And he did me like that all night, beat me and made me have sex all night."

While BJ was restrained, the appellant left the room and came back with a "long gun." BJ testified, "He was rubbin' it on my body. He stuck it in my vagina sayin' if I didn't do what he would say he would blow me up." The appellant kept BJ restrained for approximately four hours. The ties caused swelling in her ankles and wrists. BJ stated that the appellant also bit her on her right breast. Additionally, the appellant attempted to engage in anal sex, but BJ managed to stop him. During the night the appellant held "a grenade or something" and repeatedly threatened to "pull the pin."

The next morning, May 12, 2000, the appellant untied BJ and went into the kitchen to cook breakfast. Afterwards, the appellant told her that they would leave after his shower. He kept the house key with him when he went in the bathroom. While the appellant was in the shower, BJ escaped through a living room window. Although the window opening was only thirteen inches, BJ stated that she escaped easily because she weighed approximately 110 pounds. As she was running away, she looked back toward the house and memorized the license plate number of the car driven by the appellant.

BJ hailed assistance from a passing motorist, an unknown white man driving a red truck. He took her to a liquor store on Northshore Drive and told her that she would be safe there because his "buddy" worked inside. After leaving her, the stranger left to go to work. BJ entered the liquor store and asked to use the telephone, stating that she had been raped and kidnapped. BJ called 911, and the police arrived shortly thereafter. At trial, BJ denied that the appellant took her to that area so she could catch the bus.

BJ gave police the license plate number of the appellant's vehicle and described the house where she had been held. She accompanied police to the location so she could identify the house, then they transported her to Fort Sanders Regional Medical Center.

BJ acknowledged that she initially told Investigators A.J. Loeffler and Kathy Pappas that she did not know the appellant's other victims. However, she explained that police never told her the names of the other victims. At trial, she admitted that she was acquainted with JJ, but she maintained that she did not know MH.

BJ did not give a statement to police until May 24, 2000. BJ explained that her mother died shortly after the incident, and the burial occurred on May 22, 2000. She stated that if she left any information out of her statement, it was because her mind was not clear due to her mother's recent death. BJ testified that the appellant raped her eight to fifteen times, and she said, "Some I remember, some I don't." BJ explained that she tried to "black it out of my mind because he would beat me."

Next, Clarence McGill testified that on the morning of May 12, 2000, he was working at Warehouse Liquor on Northshore Drive when a lady came into the store to use the telephone. McGill could tell that the woman was distraught, and he and the owner of the business allowed her

to make a call. The woman called 911, and police arrived shortly thereafter. McGill said that the woman was not crying. McGill stated that he did not have a friend who drove a red truck.

A.J. Loeffler testified that he was a Major Crimes Investigator with the Knoxville Police Department. On the morning of May 12, 2000, he was dispatched to Warehouse Liquor, arriving at the location at approximately 9:30 a.m. When he arrived, BJ was sitting in the back of a police car talking with another officer. Investigator Loeffler stated that BJ "seemed very distraught, very upset. She wasn't bawling hysterically, but she was quite upset." Investigator Loeffler observed that parts of BJ's hair had been pulled out and were missing. Additionally, BJ's "clothes were distraught or unkempt or untidy."

Upon checking the license plate number provided by BJ, Investigator Loeffler determined that the vehicle belonged to Hazel Adams who lived nearby at 7809 Westacres Drive. BJ agreed to ride in the back of a police cruiser and identify the house in which she was held. BJ was uncomfortable, and as they neared the residence she "cowered down in the backseat." After some coaxing from Investigator Loeffler, BJ raised her head and identified 7809 Westacres Drive as the location where she had been raped and held against her will. A gray car bearing the license plate number BJ had given police was parked on the carport.

Later, Investigator Loeffler returned to the house in an unmarked vehicle. He was accompanied by the criminalistic unit driving a vehicle plainly marked "Knoxville Police Department, Crime Scene Unit." Investigator Loeffler opined that the vehicles would have been visible from inside the house. Despite the presence of the car and repeated knocks on the door, no one responded. Specialist Danny Crenshaw with the criminalistics unit took fingerprints from the outside of the house, but BJ's fingerprints were not found on the window. However, Investigator Loeffler stated that they were unable to fingerprint the inside of the window because, at that time, they did not have a warrant to enter the residence.

Investigator Loeffler testified that BJ related the events of her abuse to him. BJ told him that the appellant first made her perform oral sex, followed by vaginal sex. BJ never mentioned a grenade or a shotgun. At the hospital, BJ's property was inventoried. She did not have a purse with her and carried no money. Investigator Loeffler noted that BJ was not bleeding, but she did have marks on her.

Investigator Loeffler went to BJ's house after the incident to show her a photographic line-up and to schedule a time for her to give a formal statement. Investigator Loeffler said that BJ's mother was there and was "very ill." Therefore, he was unable to talk with BJ at that time. BJ's formal statement was taken after the death of her mother.

Dr. Michael Deboer, the emergency room physician who examined BJ after she was brought to Fort Sanders Regional Medical Center, also testified at trial. Dr. Deboer stated that BJ was very distraught when he first saw her. Her behavior was consistent with a recent victim of a traumatic event.

-4-

Dr. Deboer completed rape kit testing on BJ and discovered no visible trauma to her vaginal area. Regardless, Dr. Deboer explained that

> in terms of vaginal trauma in a nonvirginal sexually active woman it is not very common to see trauma to the labia or to the introitus itself, unless there was a foreign body used. It depends on how vigorous, but it also depends on what – what was actually inserted in there. Again, a sexually active woman with – of child-bearing age with a normal vaginal vault, you can't 100% say yes or no in terms of bruising. If there's bruising, certainly that indicates that. If there's no bruising, it does not . . . refute that.

However, Dr. Deboer theorized that, generally, he would expect to see evidence of trauma if a victim had been forcibly raped "[e]ight to fifteen times." Dr. Deboer acknowledged that BJ never reported that the appellant had inserted a long gun into her vagina. Nevertheless, he maintained that whether the insertion of a shotgun or rifle into the vagina would leave trauma "depends on the force, and it depends on the degree of entry." In sum, the doctor opined that BJ's lack of vaginal trauma did not refute or confirm her claims of sexual assault.

Dr. Deboer reported that BJ had no bleeding, but she did have some bruising to her upper left forearm, her right elbow, and her right breast. Additionally, some of her hair had been pulled from her head. Dr. Deboer noted, "There was some edema or swelling to the ankle area, but it was hard to tell whether or not that was directly related to anything other than her own body habits." The doctor opined that the swelling did not prove or disprove that BJ had been restrained.

The second victim, MH, testified that around 10:30 or 11:30 p.m. on May 15, 2000, she went to visit friends at Austin Homes near Summit Hill Drive in east Knoxville.[2] While there, she drank a few beers and took some Xanax pills. MH admitted that at that time she was using drugs illegally; however, at the time of trial, she had been "clean" for three months. Around 1:00 or 1:30 a.m., MH decided to go home and began asking for a ride. Due to severe arthritis in both knees, she could not walk home. MH's friend, Eugene Brody, arranged for his uncle, the appellant, to drive MH home. MH had never met the appellant prior to this occasion.

MH rode in the front passenger seat of the appellant's gray Ford Granada. The appellant began driving erratically and passed the turn-off to MH's home. When MH remarked upon the missed turn, the appellant stated that he had to run an errand and would take her home when he was finished. Specifically, the appellant said that "he had to take care of some business, that it was his wife's family home or something and she had pissed him off and he was just getting a little revenge back."

---

[2] The appellant was acquitted of all charges relating to this victim.

After driving around for a lengthy amount of time, the appellant drove onto the interstate, traveling toward west Knoxville. MH testified that the appellant was driving like "he had lost his mind basically." He wove in and out of traffic at excessive speeds and occasionally drove in the middle of the road. The appellant took the Papermill Drive exit and crossed Kingston Pike onto Northshore Drive. He drove through a residential neighborhood and did "donuts and wheelies" in a yard. The appellant began acting "schizophrenic," having wild mood swings. He stated that his wife was a "trifling bitch that he couldn't tolerate and the bitch was going to pay, and she was a stupid bitch and a whore." Eventually, the appellant calmed and offered MH $200 "to ride with him, just to be his buddy for the night." He claimed that he needed a friend and wanted a woman's point of view. MH declined the offer.

Ultimately, the appellant parked the vehicle on a carport outside of a home. MH believed that the appellant was drunk and needed to go inside to sober up before taking her home. Therefore, she accompanied him to the house. The appellant tried to unlock the front door with a key, but he could not get the key to work. He then went to the rear of the house and entered the house through a back door. He came through the house, opened the front door, and ushered MH inside. Once she was inside, he closed the door, locked it with a key, and placed the key in his pants pocket.

Thereafter, the appellant walked toward the back of the house, "talking to himself, mumbling about his wife and – and how he was sick and tired of us wom[e]n and sorry bitches and this and that." He asked MH to come into the bedroom, and she complied. MH testified that the room was painted pink and she observed some Mother's Day cards. The appellant came into the bedroom, telling MH to get undressed. MH thought the appellant was joking, but the appellant warned, "Bitch, I'm dead serious. Unless you want an ass kickin', you get your ass undressed." MH testified that she was a slight woman weighing 105 pounds; therefore, even though the appellant had not yet displayed a weapon, she complied with his instructions.

After MH undressed, the appellant ordered her to get on her knees and perform oral sex on him. The appellant also attempted to penetrate her vagina; however, he could not obtain an erection. Frustrated, the appellant digitally penetrated MH's anus and threatened penile penetration if she did not comply with his orders. When MH begged the appellant to stop, he became apologetic and he instructed her to get dressed. "He was saying it wasn't his fault, that his wife had just driven him crazy and he was all messed up in the head with what she was doin' to him."

While MH dressed, the appellant again went into the bathroom. After returning, he informed MH that he was not finished with her, and she should again get undressed. The appellant again digitally penetrated her anus and threatened penile penetration if she disobeyed. When the appellant failed to obtain an erection, he became angry, pulled MH's hair, and struck her. After the incident MH had bruises on "[h]er arms, chest, legs and back." The appellant allowed MH to clean up and get dressed, then changed his mind again and instructed her to remove her clothes. The appellant inserted his penis into MH's rectum, vagina, and mouth. MH testified that the appellant did not ejaculate at any time during the incident.

The next morning, the appellant told MH to dress and get ready to leave. However, after she was dressed and at the door, he changed his mind. The appellant again penetrated MH's mouth and vagina with his penis and attempted to penetrate her anus. The process of instructing MH to dress and undress was repeated, and the appellant threatened MH with a gun. The appellant again orally, vaginally, and anally penetrated MH. The appellant also lifted MH off of the floor by her hair.

Before taking MH home, the appellant cooked some food to eat, and he offered MH food and orange juice. At approximately 9:30 or 10:00 a.m., the appellant and MH left the house. The appellant drove into the parking lot of a convenience store, acting as if he intended to turn around and return to his house. When MH began screaming, the appellant drove onto the interstate, traveling toward east Knoxville. When the appellant began driving on Gay Street in downtown Knoxville, MH, fearing he would not take her home, jumped out of the vehicle and walked to her home in Townview Towers. MH testified that she tried to overdose on Xanax when she got home. She acknowledged that she did not report the offenses until May 26, 2000, but she explained that she feared she would not be believed because of her history of crack cocaine usage.

MH maintained that she did not know BJ, but she and JJ, the third victim, had mutual friends. When questioned regarding inconsistencies in her trial testimony and statements she had previously given police, MH stated that she had been on crack cocaine, and her mind was clouded. Specifically, when she was confronted with her statement alleging that the first sexual act the appellant forced her to perform was anal sex and that the appellant only made her dress and undress twice, MH conceded that her trial testimony could have been in error. She opined that some of the inconsistencies were due to forgetfulness because of drug use. Regardless, MH maintained, "I did not make up what he did to me."

JJ, the appellant's final victim, testified that she and the appellant married in 2000, but they were living apart at the time of the offenses. On April 8, 2000, the appellant "kicked down" the front door of the duplex where JJ was residing. When JJ attempted to escape through the back door, the appellant grabbed her and took her back inside, striking her several times. As a result of the appellant's actions on April 8, 2000, the appellant was charged with assault, and JJ sought an order of protection.

After the April 8 incident, JJ began living with her family in order to avoid the appellant. On the afternoon of May 19, 2000, JJ and her friend, Fay Delaney, went to the Citgo convenience store on Magnolia Avenue to "grab a bite to eat." When they arrived, JJ got out of Delaney's car, leaving her purse inside, and walked toward the store. The appellant was sitting in his mother's gray car which was parked to the left of the store. As JJ passed, the appellant said, "Bitch, get in the car right now." The appellant displayed an object that was wrapped in cloth. Fearing that the appellant had a gun, JJ got into the front passenger seat of the vehicle.

The appellant took off "fast" from the convenience store and drove via the interstate to his mother's house at 7809 Westacres Drive. During the drive, the appellant told JJ how much he missed her. When they arrived at the house, the appellant ordered JJ to go inside. The appellant followed her, carrying the cloth-wrapped object. The appellant's mother was not there.

When JJ asked the appellant where his mother was, the appellant began calling her vulgar names and told her, "You're going to die tonight." The appellant accused JJ of "bein' with another man and draggin' me all through the hallway. And he would just – beatin' me just constantly." He grabbed a necktie out of "the first bedroom" and choked her with it, pulling as hard as he could. JJ scratched her own neck when she tried to pull the necktie away from her throat. JJ tried to crawl away and ended up in a pink bedroom. The appellant grabbed a beer bottle from the trash and slammed it into the side of JJ's head. JJ testified, "And blood just started splashin' and he just kept hittin' me and kept hittin' me. And so I just couldn't remember nothing else until the next morning."

When JJ woke the next morning, she was dressed in a bathrobe and was lying in the middle of a white four poster bed in the pink bedroom. When she raised up, her head started bleeding. The appellant again threatened JJ's life. JJ became sick and ran into the bathroom to vomit. The appellant chased her and pulled her off of the commode. He dragged her toward the shower curtain and tried to smother her with it. Then, the appellant ran water in the bathtub, shoving JJ's head in the water, attempting to drown her. Afterward, he took her back into the pink bedroom and "forced sex on [her]." JJ maintained that the appellant hit her head against "the bed, the wall, and a candle." Additionally, the appellant burned her with a cigarette.

JJ testified that on Saturday, she and the appellant were in the kitchen when the appellant told her to "hold my head down and [he] just got to cuttin' my hair [with a knife]." While cutting her hair, the appellant "said he gonna put some kind of spell on me or all kind of crazy, weird things. It seemed like he changed to a different – five different people."

Later, the appellant took JJ into another bedroom and again slammed her head against the wall. Thereafter, the appellant became apologetic and told JJ that he would stop hitting her. They began watching a sports game on television in the other bedroom. The appellant again acted like a different person and repeatedly raped JJ, slamming her head into the wall. Additionally, the appellant hit JJ with a flashlight and "tried to force sex with the flashlight on me." The appellant called JJ foul names, then told her he was sorry.

Eventually, the appellant left to purchase beer, Dr. Pepper, and a rose for JJ. JJ peeked out the window and noticed that the appellant's vehicle was gone. She tried to exit through the front door, but it was locked. She explained, "I couldn't get out front. And then I went to the back and I passed out. And then by the time I came back to, I heard a car comin' back. And I just tried myself back toward the living room door."

On Sunday, JJ attempted to calm the appellant, telling him that they would get back together and seek counseling. The appellant told her that he wanted a son, and JJ assured him that she would make an appointment with a doctor to have her "tubes untied." JJ testified that she said anything she had to in order to escape. JJ testified that the appellant gave her a bath and "tried to put medicine on me and patch me back up together, I guess to go to the public." Then, the appellant obtained the cloth-wrapped object and his cellular telephone, and told JJ that they were going to Concord Park. Fearing that the appellant would dump her in the nearby river, JJ asked not to go there. The

appellant informed JJ that "[w]e're going to go and let everybody know that we're back together again."

The two proceeded to Linden Park where the appellant played basketball for a brief time. JJ testified that the appellant made her get out of the car and sit near the court where he could watch her. The appellant kept the cloth-wrapped object nearby while he was playing basketball. JJ was unable to reach it. The appellant threatened to "do everybody in" if JJ attempted to get away. Later, the appellant took JJ to Eugene Brody's house and again threatened to "do everybody in" if she told anyone about the events.

Finally, the appellant took JJ to her mother's house. When they got out of the car, JJ told the appellant "that he couldn't bring the gun in. So he took whatever he had wrapped up – I was assuming it was a gun. And he put it in the trunk. He said, 'I wouldn't dare bring that around the kids.'" The appellant went into the living room of the house while JJ went into the bedroom to find her mother. JJ's daughter and niece were in the bedroom, and JJ instructed them to find JJ's older sister, Jacqueline Johnson, and bring her to the bedroom. The children complied.

JJ told Johnson what had occurred between herself and the appellant. Thereafter, Johnson went into the living room and told the appellant he had to leave because he had beaten JJ "near to death." Johnson informed the appellant that the family would take JJ to the hospital, and they would advise the police of the appellant's actions. JJ's brothers were in the house during this conversation. The appellant left the house, warning the brothers that "if they come out he was gonna do them – blow off – their M-F head off cause [JJ] was his wife and they can't get in our business and things like that."

As soon as the appellant left, JJ's family took her to Baptist Hospital. JJ acknowledged that she told the doctors that the appellant had forced her to have vaginal sex with him. She admitted that she did not reveal that he also forced her to engage in oral and anal sex. JJ explained that she was "embarrassed" and "uncomfortable" with the doctors because they were strangers.

JJ also acknowledged that her statements to Investigator Pappas did not include certain acts of abuse by the appellant and some were chronologically inaccurate. JJ maintained, "He did more than this, what I've even gone through so far. Some things just come back to me. Some things I don't want to know." She opined that when talking with Investigator Pappas, "I probably did not put it in the right order. I probably was just telling her something of it. . . . I can't think of everything." Regardless, JJ asserted, "I may have my days mixed. But the way I just said it here on the stand is the way it really happened. At that moment [I gave the statement] you're lucky to have gotten one word out of me."

JJ's sister, Jacqueline Johnson, testified at trial that she was at her mother's home on the night of May 21, 2000. At approximately 7:00 or 8:00 p.m., she heard JJ and the appellant come into the house. After searching for her sister, Johnson found JJ in the bedroom, "shakin' real bad." Johnson stated, "[S]he had this mark all around her neck where she had been choked real bad, and she had burns where she had been burned with a cigarette everywhere. And her head was bleedin'

and everything." Johnson also noticed that JJ's hair "was gone, part of it. And it was blood, like a gash had been cut out of her head."

JJ told Johnson that the appellant had kidnapped, raped, and tried to kill her. Johnson ordered the appellant to leave the house. Johnson and her brother followed the appellant as he walked out of the house. Once he was beside his car, the appellant started "fussing," and he pulled from out of the car a dark gun that was approximately one foot long. The appellant left and Johnson took JJ to Baptist Hospital, arriving at approximately 10:30 p.m. Johnson testified that at the time of trial, JJ had not yet divorced the appellant.

Dr. R. Deaton Smith testified that he was the emergency room physician who treated JJ when she arrived at 10:32 p.m. on May 21, 2000. Dr. Smith noted that the medical records reflect that JJ told the triage nurse "that she was kidnapped on Friday, complains of assault Friday, Saturday and Sunday, was complaining of a headache, said that she was choked until she passed out and was complaining of back pain. Said she had been threatened with a gun." JJ told Dr. Smith "that she had been beaten up, assaulted, and also told [him] that she had been forced [by her husband] to have vaginal intercourse."

Dr. Smith stated that in order to complete rape kit testing on JJ, he performed a physical examination, including an examination of the victim's pelvic region. He noted no trauma to JJ's vaginal area, but he asserted that this did not undermine her claim of rape. JJ had two small, old lacerations to her right scalp and "the hair was matted together with blood . . . dried blood." Dr. Smith stated that scalp wounds bleed profusely and for a long amount of time. Regardless, Dr. Smith did not have to stitch JJ's scalp. Dr. Smith noted that any bruising or bumps which would be caused by a beer bottle being slammed against someone's head would generally be difficult to see on a person's scalp.

Additionally, JJ had abrasions to the bridge of her nose, her neck, right forearm, shoulder, and her left knee. She also had bruises on both knees and a fairly large bruise and tenderness to her right upper back along her shoulder blade. The doctor explained that the linear abrasions on JJ's neck could have been caused by a ligature being applied to her neck. Additionally, JJ had what appeared to be fingernail scratches on her neck. The scratches could have been caused by attempts to remove a ligature. Dr. Smith stated that he did not believe that JJ's abrasions were caused by a cigarette or cigar because an abrasion was different than a burn. However, Dr. Smith conceded that after a couple of days, it becomes difficult to determine the difference between an abrasion, which would be caused by rubbing or hitting an area, and a burn.

Dr. Smith acknowledged that no rectal or oral exam was performed because JJ did not report attempted or successful anal or oral penetration. Furthermore, Dr. Smith stated that JJ did not indicate that she had lost consciousness during the event. Moreover, while JJ reported that she was threatened, she did not indicate that a knife or gun had been used; instead, the form she completed noted that the appellant had used his fists and tried to choke her.

-10-

Kathy Pappas, an investigator with the Family Protection Section of the Knoxville Police Department, testified that on May 12, 2000, she and her partner, Jonne Crick, responded to a 911 call from a liquor store in the Rocky Hill/Northshore Drive area of west Knoxville. They arrived at 11:42 a.m. and noticed that several officers in marked units were already at the scene.

BJ was sitting in the back of one of the patrol cars. She was very distraught and was shaking and crying. BJ kept playing with her hair and saying that she did not have any hair because the appellant had pulled it out. Investigator Pappas recalled, "She had a big gap of her hair was – her actual – the weave itself had – was glued to her hair, and there was actually a bald spot where the hair and weave all had been pulled out." Investigator Pappas maintained that BJ had no possessions except the clothing she was wearing and a blue bandana. Specifically, Investigator Pappas stated that BJ did not have a purse or money.

Investigator Pappas took BJ to Fort Sanders Regional Medical Center where her wounds were treated. Investigator Pappas asserted that another officer took photographs of BJ's wrists and ankles to show the ligature marks on her body. The photographs revealed that BJ's ankles and wrists were red, indicating that she had been recently bound.

Subsequently, on May 22, 2000, Investigator Pappas was dispatched to Baptist Hospital because JJ was there, claiming that she was abducted and raped. When Investigator Pappas arrived at the hospital around midnight, JJ "was in a room in the fetal position and she was just clinging with a sheet." Investigator Pappas noted that JJ had scratch marks on her neck resulting from her attempts to claw a necktie away from her throat. She had a bite mark on her ear and burn marks on her arms and the bridge of her nose. Her eye was red due to the strangulation, and she had a bruise on her shoulder. In sum, Investigator Pappas stated, "She was just battered."

Investigator Pappas testified that JJ was very upset and distraught. Additionally, she was nervous and talking so rapidly that she could barely be understood. "It was like . . . she couldn't calm down enough to talk to me." JJ told Investigator Pappas that her husband, the appellant, was her assailant. JJ said that the appellant had taken her to his mother's house on Westacres Drive. Investigator Pappas testified that when she heard the Westacres Drive address "it was like a light bulb that went on in my head because of the other incident [with BJ]."

Based upon the information provided by JJ, Investigator Pappas, along with officers from the Knoxville Police Department and the Knox County Sheriff's Department, went to the appellant's address at 7809 Westacres Drive at approximately 2:30 a.m. on May 22, 2000. When Investigator Pappas arrived, she noticed that the appellant's gray car was on the carport. The officers knocked on the front door, and Investigator Pappas noticed someone standing in front of the peephole inside the front door. Regardless, no one responded to the knocks. The officers continued knocking for about forty-five minutes, announcing that they were officers with the Knoxville Police Department and wanted to speak with the appellant.

Investigator Pappas left the other officers at the scene and went to obtain a search warrant. She returned with the search warrant at 6:45 a.m. on May 22, 2000. After the search warrant was

issued, negotiators, K-9 officers, and S.W.A.T. officers with the Knoxville Police Department and the Knox County Sheriff's Department arrived at the scene. The negotiators began calling the appellant's house at regular intervals, attempting to set up a line of communication with the appellant. Someone in the house would pick up the telephone, then immediately hang up. Thereafter, the answering machine began to answer until the machine could hold no more messages. The officers knew someone was in the house because they saw movement in the kitchen and witnessed a shadow pass by the peephole in the front door.

Finally, at around noon on May 22, 2000, Detective Larry Vineyard arrived at the residence and persuaded the appellant to exit the house. A young woman came out of the house with the appellant. The woman was unharmed and did not claim that the appellant had hurt her.

After the appellant was taken into custody, he was transported to the Knoxville Police Department headquarters. Investigator Pappas tried to interrogate the appellant, but he "proceeded to call me everything but a white girl." Specifically, Investigator Pappas stated that the appellant called her "a lot of bitch words." Investigator Pappas noted that she was the first female police officer to interact with the appellant.

On cross-examination, Investigator Pappas was questioned about the statements of the three victims. Investigator Pappas testified that she understood that MH did not know JJ, but BJ and JJ were acquaintances. Investigator Pappas also acknowledged that MH's maiden name was the same surname as that of BJ and JJ. Finally, Investigator Pappas conceded that BJ never told her that the appellant threatened her with a grenade or that he inserted a gun into her vagina.

Gerald Smith, an officer with the Crime Scene Detail Department of the Knoxville Police Department, testified that at noon on May 22, 2000, he was called to 7809 Westacres Drive. Because Officer Smith's main duty was investigative support, he met with Investigators Loeffler and Pappas to discover what actions were to be taken.

At 12:30 p.m., Officer Smith entered the house from the door leading to the carport. Officer Smith recalled that the door opened into a combination living room and kitchen. A hallway then led to the bedrooms. Officer Smith observed blood on the carpet and wall of the hallway and in both bedrooms. Specifically, Officer Smith recalled that there was blood in the pink bedroom. Officer Smith collected a necktie which was in the pink bedroom. Officer Smith did not find any guns in the house, and no hair was found.

The final witness for the State was Agent Bradley Everett with the Forensic Division of Tennessee Bureau of Investigation. Agent Everett specialized in serology and DNA. Agent Everett testified that the blood found throughout the appellant's house belonged to JJ. Additionally, the swabs from BJ's rape kit positively identified the appellant as the donor of the sperm. Regarding the swabs from JJ's rape kit, Agent Everett explained, "There was very little DNA in this sample, but there was enough to say that in the DNA profile of the sperm fraction that was a mixture that I could not exclude either [JJ] or [the appellant]."

Karen Price was the first witness to testify on behalf of the appellant. Price testified that in May 2000, she lived at 7811 Westacres Drive, directly behind the home of the appellant's mother. Price stated that she could hear things from the 7809 Westacres Drive address. Additionally, at the time of the offenses, Price had two dogs that barked at everything.

At 10:00 a.m. on Friday, May 12, 2000, Price was looking out her big picture window when she saw the appellant and a small, black woman leaving the residence in the appellant's mother's car. Price opined that the woman was the appellant's girlfriend. A couple of hours later, police came to the residence.

Price recalled that on May 22, 2000, numerous officers arrived on Westacres Drive. In fact, police used her house as a base of operation. The appellant finally came out of the residence at noon. Price stated that her dogs did not wake her by barking at 2:30 or 3:00 a.m. that morning. However, Price conceded that she did not talk to the appellant's investigator about the case until two and a half years after the events.

The appellant testified on his own behalf. At the time of trial, he was forty-six years old and lived with his mother at 7809 Westacres Drive. The appellant maintained that he had never met BJ prior to May 11, 2000. That night, the appellant's mother was in New York so the appellant decided to drive over to "Magnolia and M.L.K." to hire a prostitute. The appellant chose that area because prostitutes were reputedly available there.

As the appellant was driving down Spruce Street, BJ "flagged [him] down," pointing to herself. The appellant stopped his car, and BJ got inside. They negotiated the price for her services, agreeing that the appellant would pay BJ twenty dollars for oral sex and twenty dollars for vaginal sex. Additionally, the appellant intimated to BJ that he had crack cocaine. He thought that BJ would be more "comfortable" with him if she thought she could obtain crack cocaine from him. The appellant told BJ that he had a house in west Knox County, and she agreed to go home with him. The appellant testified that he never threatened BJ or displayed a weapon. Moreover, the appellant maintained that he did not own a gun, and his mother hated guns.

On the way to his mother's house, the appellant stopped at a Conoco convenience store on Magnolia Drive so that BJ could buy cigarettes. After arriving at 7809 Westacres Drive, they got out of the car and went inside the residence. The appellant explained that the door to the house could be opened from the outside with a key and also locked from the inside with a key. The appellant explained that his grandmother suffered from Alzheimer's and this type of lock had been installed to prevent her from getting out and wandering around the neighborhood. However, because his grandmother had passed away, the appellant usually left the keys inside the lock on the interior of the door.

The appellant related that after going inside, he and BJ sat in the living room, drinking beer. When BJ asked for the crack cocaine, the appellant confessed that he had none, but he did have marijuana. BJ was a little angry and disappointed. She did not smoke any of the marijuana. Soon, the two went into the pink bedroom. BJ performed oral sex upon the appellant until he reached

-13-

orgasm. They returned to the living room to smoke and drink because the appellant needed "a little time to recharge."

After resting, the appellant and BJ returned to the pink bedroom and had vaginal intercourse. Afterwards, they got dressed. BJ asked the appellant to take her home, and the appellant told her that he was in no condition to drive. The appellant feared being stopped by police while he was under the effects of the marijuana. The appellant suggested that BJ call a friend to pick her up, or wait until morning and he would drive her home. BJ decided to wait. The appellant fell asleep on the couch while BJ stayed in "the big chair" in the living room.

When the appellant woke, it was light outside. BJ was still there and wanted to go home. The appellant cooked breakfast and ate. Then, at around 10:00 a.m., they got into the gray car and drove east. The appellant testified that he "had decided to take her to the bus stop without her actually knowing I was taking her to the bus stop."

The bus stop on Northshore Drive was located directly across the street from a strip mall containing Warehouse Liquors. The appellant drove into the parking lot of the strip mall, gave BJ a dollar, and explained that the bus would take her to the east side where she needed to go. BJ became angry and cursed the appellant. She "stormed out of the car and slammed the door." Then, the appellant drove away.

The appellant stated that BJ did not have a bald spot on her head when she got out of his car at the strip mall. He theorized that she was lying about the rape and kidnapping because she was mad at him for not giving her crack cocaine or a ride home. The appellant maintained that after leaving BJ on Northshore Drive, he returned home, changed clothes and jogged to West Town Mall. Once there, he "walked around the mall and checked stuff out." He returned home at approximately 1:00 p.m., but he did not discover any evidence that police had been there in his absence.

The appellant testified that he first met MH on the night of May 15, 2000, at the home of Eugene Brody. The appellant stated that he and JJ were close friends with the Brodys. The Brodys referred to JJ as their sister and to the appellant as their uncle. On the night of May 15, Eugene Brody asked the appellant if he would drive MH home. The appellant agreed to do so.

The appellant maintained, "When she got in the car she asked me if I wanted a date, and I said, 'Sure.'" He explained that MH's query meant that she was "willing to give you some sex for money." They agreed that the appellant would pay MH twenty dollars for vaginal intercourse. The appellant told MH that he had a house in west Knox County, and she agreed to go there. The appellant denied using a weapon or threatening MH. He also denied driving "crazy," stating that he would not do that while driving his mother's car.

Once they arrived at the house, they each drank a beer. After finishing the beer, they had vaginal intercourse once. The appellant then drove MH home.

-14-

Finally, the appellant testified regarding his encounter with JJ. The appellant testified that he and JJ began having trouble "when her boyfriend got back out of jail." He denied hitting JJ on April 8, 2000, but he acknowledged that he was arrested a few days later. Sometime in May, prior to May 19, 2000, the appellant went to court and discovered that he had been charged for assaulting JJ on April 8, 2000. The appellant claimed that JJ went to court and lied about him under oath.

The appellant recalled that on May 19, 2000, he first saw JJ at the home of Eugene Brody. She was there with her friend, Fay Delaney. JJ asked the appellant how he was doing, and the appellant replied that he had been gambling so he had a little money. The appellant left Brody's residence first. A little while later, Delaney and JJ "cut off" the appellant while he was driving. JJ told him that she wanted to talk, and the appellant told JJ to meet him at the Citgo convenience store on Magnolia Avenue.

When they arrived at the Citgo, the appellant stopped his car, and Delaney parked her car next to the appellant. JJ got out of Delaney's car and got into the appellant's vehicle. The appellant recalled that "she said that I'd been with these whores and I'd given them her money." The appellant told JJ that if she only wanted to argue then she should leave. She was apologetic and told the appellant that she wanted to reconcile with him.

The two drove to the Fourth Street Park where they sat and talked in the playground area. They agreed to try to make their marriage work. The appellant's agreement was conditioned on JJ agreeing not to have him arrested and "make [him] look like a bad guy." After leaving the park, they stopped at a Pilot convenience store on Northshore Drive. The appellant went in and bought beer, cigarettes, Dr. Pepper, and a rose for JJ.

JJ then drove them to the appellant's mother's home. A couple of minutes after entering the home, JJ noticed cigarette butts with lipstick on them. JJ got mad and said, "I know these whores that you've been with. I know them." She started cursing and fighting with the appellant. She bit him, and he hit her in the face and head. The appellant stated that "when I hit her in the head, I busted some scabs." He explained that JJ had burned her head using "hot combs" on her hair while she was high. The appellant denied tying a necktie around JJ's neck, striking her head with a beer bottle, or slamming her head into a wall. The appellant also denied burning JJ with cigarettes, claiming that he only smoked cigars. However, he admitted that he pushed her against a wall.

The appellant stated that he and JJ had fought throughout the house, explaining that JJ received all of her injuries during the course of the fight. The appellant observed, "She's not a very large lady." He theorized that the blood on the carpet came "from hitting her, she falls down; she gets knocked into stuff. . . . We had a pretty good fight." The appellant opined that JJ had marks around her throat because during the fight he grabbed her around the neck and squeezed.

The appellant testified that he apologized to JJ after seeing the blood. He invited her to call the police, but JJ wanted to "patch things up." JJ did not seek medical attention, fearing it would get the appellant in trouble. They "made up" because "in our own little cocky ways, we loved each other." The appellant stated that he "felt bad" about JJ's injuries. Accordingly, at the conclusion of

the fight "[w]hat I did was start to try to get the blood from – to stop the bleeding and run her some bath water 'cause I had hit her and stuff too on her body and stuff." He washed JJ and put medicine on her.

After the bath, they went into one of the bedrooms to watch a basketball game. The blood on the headboard in that room resulted from JJ leaning her head against it while they watched the game. When the game was finished, they engaged in vaginal intercourse "because she was feeling better" and was willing.

On Saturday, they again had consensual sex. Later that day, the appellant suggested that JJ let someone know where she was. JJ declined to do so, stating that she and the appellant needed to be alone. JJ told the appellant that she had scheduled an appointment for Monday so that he could sign papers naming her as the "benefactor" for his "benefits." The appellant refused because JJ kept going back to her boyfriend and would not stop using crack cocaine. The appellant explained, "And I was doing pretty good by myself."

On Sunday, May 21, 2000, the appellant went to the store, leaving JJ at home. When he returned, he discovered Investigator Loeffler's card in his door. Later that day, the appellant and JJ left his mother's house. They visited the Brody's residence, then went to Linden Park so the appellant could play basketball. JJ stayed in the car and watched the appellant play. The vehicle was parked thirty to forty yards from the basketball court. During the game, JJ had possession of the appellant's cellular telephone.

At the conclusion of the game, they went to JJ's mother's house. After twenty to thirty minutes, Johnson came up to the appellant and said, "[W]e don't like you beating up on our sister. You're going to have to leave." The appellant testified that he left at around 8:00 p.m.

The appellant then went to "MLK" to "find me a girl." He discovered a young woman and agreed to pay her twenty dollars for sex. The appellant took the woman to his mother's house where they completed the "business transaction." Around 2:00 a.m. on May 22, 2000, he and the woman were "sleeping and passed out." In fact, the appellant did not know police were around his home until he woke at 9:00 a.m. He stated that no one knocked or told him to come out. He believed police were there because he had "beaten [JJ] up." The appellant specifically denied kidnapping or raping BJ, MH, and JJ.

On cross-examination, the appellant admitted that after his arrest he called Investigator Pappas a "white bitch." However, he denied that he ever spoke of BJ, MH, or JJ in such derogatory terms. The appellant also admitted that he had been convicted of theft, larceny, intimidation, and multiple counts of passing worthless checks.

The appellant asserted that JJ was seeing someone else and doing crack cocaine in May 2000. Nevertheless, he wanted to be with her because "I married her . . . and I'm a gambler. I took a long shot. I thought I could turn her into a good girl." The appellant averred that he took his marriage

-16-

vows seriously. Yet, explaining why he hired prostitutes, the appellant stated, "I was going to get my little sex drive taken care of."

The final defense witness was Declores Geter. Geter testified that she was BJ's next-door neighbor in May 2000. She also knew JJ. Geter stated that JJ sometimes visited BJ. In fact, at 11:30 p.m. or 12:00 a.m. on the night BJ was kidnapped, Geter saw JJ at BJ's apartment, standing around the back of the duplex with several people who were there for a party.

Geter stated that she saw BJ the day after the rape. She stated, "All I can say, for a person that has been raped, she did not act in that stage." Geter thought that BJ acted "very calm" and "very relaxed." Additionally, BJ was "excited" because the Crisis Center was "going to help her get a job; they were going to help her get an apartment." Geter stated that BJ had been going through a difficult time because of her mother's illness and subsequent death. Regardless, BJ told Geter that she had been kidnapped and raped multiple times.

At the conclusion of the proof, the appellant was convicted of two counts of the rape of BJ and the especially aggravated kidnapping, aggravated spousal rape, and assault of JJ.[3] Following a sentencing hearing, the trial court imposed sentences of twelve years for the rape convictions, twenty-five years for the especially aggravated kidnapping conviction, eleven years for the aggravated spousal rape conviction, and eleven months and twenty-nine days for the assault conviction. The sentences for the rape convictions involving BJ were to be served concurrently to each other but consecutively to the sentence for especially aggravated kidnapping. The sentences for the convictions involving JJ were to be served concurrently to each other for a total effective sentence of thirty-seven years.

The appellant timely appealed, raising the following issues for our review:

1. Whether the trial court erred in denying the appellant's motions for judgments of acquittal regarding his convictions;

2. Whether the trial court erred in denying the appellant's motion for new trial in regards to both victims;[4]

3. Whether the trial court erred in consolidating the cases of the three victims for trial and erred again in failing to grant the appellant's motion to sever at the close of the State's case-in-chief; and

---

[3] On appeal, the appellant did not raise any issues relating to the assault conviction. Accordingly, we will not address any issues relating to this conviction.

[4] We conclude that this issue is encompassed in the individual issues. Raising the issues at the motion for new trial served to preserve them for appellate review. Accordingly, we will not address this as a separate issue.

4.  Whether the trial court erred in denying the appellant's pre-trial motion in limine to exclude photographs of JJ's blood in the appellant's house.[5]

## II. Analysis

### A.  Consolidation and Severance

The appellant contends that the trial court erred by consolidating the three cases for trial.  He maintains that identity was not an issue at trial and that admission of other offenses resulted in the jury inferring that the appellant had a propensity to commit crimes.  The State insists that the trial court correctly consolidated the cases because the offenses were part of a common scheme or plan and evidence of one crime would be admissible in the trial of the other.

The consolidation and severance of multiple indictments and/or presentments for trial is governed by Rule 13 of the Tennessee Rules of Criminal Procedure.  Rule 13(a) provides that the trial court may order consolidation "if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8."  Tenn. R. Crim. P. 13(b).  Rule 8(b) states that two or more offenses may be consolidated "if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character."[6]  See Tenn. R. Crim. P. 8(b).  Contrastingly, Rule 13(b) explains that the trial court may order severance of offenses prior to trial if such severance could be obtained on motion of a defendant or the State pursuant to Rule 14.  See Tenn. R. Crim. P. 13(b).  Tennessee Rule of Criminal Procedure 14(b)(1) provides that "[i]f two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others."

Our supreme court has held that "decisions to consolidate or sever offenses pursuant to Rules 8(b) and 14(b)(1) are to be reviewed for an abuse of discretion."  State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999).  "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case."  State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999).

As we have noted, in the instant case the State moved to consolidate the cases of the three victims, and the appellant opposed the motion.  Our supreme court has explained that "when a defendant objects to a pre-trial consolidation motion by the state, the trial court must consider the motion by the severance provisions of Rule 14(b)(1), not the 'same or similar character' standard of Rule 8(b)."  State v. Spicer, 12 S.W.3d 438, 443 (Tenn. 2000); see also State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *19 (Tenn. Crim. App. at Knoxville, June 28,

---

[5]  We will address these issues in a different order than that in which they were raised.

[6]  Our analysis proceeds under the permissive joinder provision of Rule 8 because we can discern no evidence supporting mandatory joinder of these offenses.  See Tenn. R. Crim. P. 8(a).

2002), perm. to appeal denied, (Tenn. 2003). In other words, it was within the trial court's discretion to consolidate the cases if the offenses were part of a common scheme or plan and if evidence of one case would be admissible in the other(s).

In examining a trial court's determination on a severance issue, the primary consideration is whether the evidence of one offense would be admissible in the trial of the other if the offenses remained severed. See Spicer, 12 S.W.3d at 445. Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" Id. (quoting Moore, 6 S.W.3d at 239). As such, the trial court must determine from the evidence presented that:

> (1) the multiple offenses constitute parts of a common scheme or plan, (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

Id. (citations omitted).

Common scheme or plan evidence tends to fall into one of three categories:

> (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

Moore, 6 S.W.3d at 240. The appellant's offenses are not part of the same criminal transaction, nor is there any claim that they are part of a continuing plan or conspiracy. Accordingly, consolidation was proper only if the offenses were of a distinctive design or were so similar as to constitute "signature" crimes. Specifically, "[e]ven though offenses may be similar in many respects, they can not be classified as signature crimes if they lack a distinct modus operandi." Shirley, 6 S.W.3d at 248. Furthermore, this court has previously noted, "A common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." State v. Hoyt, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), overruled on other grounds by Spicer, 12 S.W.3d at 447.

In the instant case, on May 11, 2000, the appellant approached BJ as she was leaving a gas station located on Magnolia Avenue. He pointed a gun at BJ and ordered, "Get in the car, bitch." The appellant was driving a gray vehicle. He drove erratically on the interstate to his mother's home at 7809 Westacres Drive. In the house, the appellant locked the door from the inside and instructed BJ to undress. The appellant repeatedly told BJ that he was hurting her because his wife "done me so wrong; I'm gonna take it out on you." After cooking for himself, the appellant took BJ to the pink bedroom and raped her orally and vaginally. He beat her and pulled out the "weave" in her hair, leaving a bald spot. At one point during the ordeal, the appellant used men's neckties to secure BJ to the bed in the pink bedroom. The next morning, BJ escaped through a window and ran for help.

MH testified that on May 15, 2000, the appellant was supposed to drive her home from a party and instead drove erratically to his mother's home at 7809 Westacres Drive. The appellant was driving a gray vehicle. Once they were inside, the appellant locked the door from the inside and instructed MH to undress. The appellant took MH to the pink bedroom and raped her orally, vaginally, and anally. During the incident, the appellant pulled MH's hair. Additionally, throughout the incident the appellant made disparaging remarks about his wife. The next morning, the appellant drove MH near her home, and she escaped by jumping from the moving vehicle.

Finally, JJ, the appellant's wife, testified that early in May 2000, she had testified against the appellant at a hearing concerning his prior assault of her. On May 19, 2000, the appellant saw JJ at a gas station on Magnolia Avenue and ordered, "Bitch, get in the car." The appellant was displaying a cloth-wrapped object that JJ believed was a gun. The appellant drove recklessly to his mother's home at 7809 Westacres Drive while telling his wife how much he missed her. The appellant was driving a gray vehicle. Once inside, the appellant attacked JJ, beating her and strangling her with a man's necktie. He hit her in the head with a beer bottle, causing her to bleed. JJ was knocked unconscious and awoke in the pink bedroom. When she woke, the appellant again assaulted and raped her. The appellant burned JJ and cut her hair with a knife.

At the conclusion of the pretrial hearing on the consolidation/severance issue, the trial court remarked that the victims "all have strikingly similar physical characteristics in terms of their size and appearance." Further, the trial court noted, "I've never heard facts that are as similar, almost identical, as the facts in this case." The court stated,

> So we have, clearly, in my judgment, a common scheme or plan; that the evidence of one crime would be admissible in the trial of the others; that it does go to the issue of intent, identity, motive, in this case; and that, therefore, although clearly it's prejudicial, it is always prejudicial, I believe that the probative value of that proof outweighs its prejudicial effect.

From the foregoing facts, we conclude that the similarities between the offenses against BJ and JJ are striking. The offenses occurred within a relatively short time span, less than two weeks. The appellant abducted both women from gas stations on Magnolia Avenue by displaying a weapon or an object believed to be a weapon. He told both women, "Get in the car, bitch." The appellant was driving a gray vehicle which he then drove erratically to his mother's house at 7809 Westacres. He beat both women and used neckties to restrain them. Additionally, the appellant pulled out a large portion of BJ's "weave," then later cut off JJ's hair with a knife. He told BJ that he was committing the offense to "get back at his wife," and he soon thereafter abused his wife in the same fashion. Both women were raped orally and vaginally, and the appellant threatened anal penetration. This court has remarked that "[a]lthough there are some differences between the two offenses, it is not necessary that the two crimes be identical in every detail." Hoyt, 928 S.W.2d at 944. Accordingly, we conclude that the offenses against BJ and JJ were of a distinctive design indicative of a common scheme or plan.

-20-

Next, we must determine if the evidence of BJ's offense would be admissible in the trial of JJ's case, and vice versa, if the cases had been severed. In order to make this determination, we must review the standard for admitting prior acts testimony as is outlined in Tennessee Rule of Evidence 404(b).[7]

Rule 404(b) allows evidence that a defendant committed a harmful act other than the one for which he is on trial. See Neil P. Cohen, et al., Tennessee Law of Evidence, § 4.04[7][a], at 4-75 (4th ed. 2000). In connection with this issue, we note that establishing the identity of an offender is the most common basis for presenting evidence of a distinctive design. See Shirley, 6 S.W.3d at 248. However, identity is not the only basis for presenting evidence of a distinctive design. Other crimes evidence is also admissible to show, motive, intent, guilty knowledge, absence of mistake or accident, or a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other. See Hoyt, 928 S.W.2d at 944.

In the instant case, the appellant's identity was not at issue. The appellant admitted that he was sexually involved with all three victims; however, he claimed that the sex was consensual. The trial court specifically found that the other acts evidence would be admissible to show the appellant's motive, intent, and lack of mistake. We agree with the trial court that the evidence of both offenses was relevant to show the appellant's motive and intent for committing the offenses. Namely, the offenses against BJ were committed by the appellant as an act of revenge against his wife after her testimony against him on other charges. We further note that "[t]he similarity of the acts makes the probative value particularly significant." State v. Edwards, 868 S.W.2d 682, 691 (Tenn. Crim. App. 1993). Accordingly, we conclude that the trial court correctly consolidated the offenses against BJ and JJ for trial.

Next, we turn to the consolidation of offenses involving MH. We note that many of the facts regarding the offenses involving MH are strikingly similar to those involving BJ and JJ. However,

---

[7] Tenn. R. Evid. 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

there are differences between the offenses involving the three women. Particularly, the method of obtaining the victim was different in the case involving MH. Moreover, the appellant did not use a necktie to restrain MH. While the trial court may have erred by consolidating this offense, we conclude that the error, if any, was harmless.

Our rules of criminal procedure provide that no conviction should be reversed on appeal "except for errors which affirmatively appear to have affected the result of the trial on its merits." Tenn. R. Crim. P. 52(a); see also Tenn. R. App. P. 36(b); Shirley, 6 S.W.3d at 250. In certain instances, a danger exists that a jury might use evidence of similar acts to determine that the defendant in question has a propensity to commit a certain crime. See Moore, 6 S.W.3d at 242. In fact, this is the rationale behind Rule 404(b). Id. However, our supreme court has explained that "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard to convict.'" Id. (quoting Delk v. State, 590 S.W.2d 435, 442 (Tenn. 1979)).

In the instant case, the appellant was acquitted of charges relating to the offenses against MH. Accordingly, the appellant suffered no harm as a result of the consolidation of the offenses involving MH with the offenses against BJ and JJ. Further, the appellant was found guilty of a lesser-included offense relating to BJ, and was acquitted of certain charges relating to both BJ and JJ. See Id. Moreover, the proof at trial was more than sufficient to find the appellant guilty of the crimes of which he was convicted. See Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *29. Accordingly, we conclude that the consolidation of the offenses involving MH with the offenses involving BJ and JJ's cases, if error, was harmless error.

Finally, in relation to this issue we note that the appellant complains that not only did the trial court err prior to trial in allowing the cases to be consolidated, but the court also erred in failing to sever the cases at the close of the State's case-in-chief. The appellant contends that evidence introduced during trial revealed that the three victims had at least a passing familiarity with each other. The trial court again reviewed the severance issue and determined that the familiarity of the victims did not change its assessment of the propriety of consolidation. We conclude the trial court did not abuse its discretion in denying the appellant's motion to sever the offenses.

B. Photographs

Prior to trial, the appellant made a motion for the trial court to exclude photographs of the inside of 7809 Westacres Drive, which photographs showed JJ's blood throughout the house. The decision regarding the admissibility of photographs lies within the sound discretion of the trial court and that decision will not be overturned on appeal absent a showing of an abuse of that discretion. See State v. Carruthers, 35 S.W.3d 516, 576 (Tenn. 2000); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Moreover, the modern trend is to vest more discretion in the trial judge's rulings on admissibility." Carruthers, 35 S.W.3d at 577. Photographs which are graphic or even horrifying may be admissible if they are relevant to an issue at trial and if the probative value of such evidence outweighs any prejudicial effect on the jury. See State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

Generally, all relevant evidence is admissible at trial. See Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

In his motion, the appellant argued, "the introduction of the 8x10 colored photographs of [JJ's] bloodstains will create unfair prejudice and mislead the jury. Admission of the photographs will result in an adverse effect on the integrity of the fact finding process by 'spilling over' into the cases involving [MH] and [BJ]. These photographs will arouse the jury's emotions rather than intellect." The State countered that the photographs were "highly probative of whether or not this was a consensual act or, in fact, a forcible rape, as [JJ] is going to testify." After reviewing the photographs, the trial court stated:

> Well, I mean, they're not pleasant, but they're certainly not shocking.
> They're not grotesque. They're not – there's nothing . . . that would
> keep these out. This is not going to inflame the jury, the fact that there
> are some blood marks, and they do have to establish that. I believe
> that these are proper evidence.

From our review, we note that the photographs depict blood stains left on the carpet and the headboard of a bed in the appellant's mother's house. Blood testing revealed that the blood was JJ's blood. The appellant was charged with the aggravated spousal rape of JJ, which offense includes an element of "especially cruel, vile, and inhumane treatment." Tenn. Code Ann. § 39-13-507(c)(1)(A) (2003). We conclude that the photographs were relevant and probative to that charge. Moreover, as the trial court implicitly found, the pictures are not so prejudicial as to outweigh their probative value. Accordingly, we conclude that the trial court did not err in admitting the photographs.

## C. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved

by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

### 1. BJ

As to BJ, the appellant was found guilty on count three of rape by placing his penis into BJ's mouth, and on count five, the appellant was found guilty of one count of rape by placing his penis into her vagina.[8] Rape is defined as the unlawful sexual penetration of a victim by the defendant without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent. See Tenn. Code Ann. § 39-13-503(a)(2) (2003). This court has previously remarked that the term "unlawful" generally refers to non-consensual acts. See State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994). As to count three, BJ testified that the appellant placed his penis inside her mouth. She asserted that she did not consent, and, in fact, she asked the appellant to stop. Accordingly, we conclude that the evidence is sufficient to support the appellant's conviction on count three.

Regarding count five, BJ testified that the appellant placed his penis inside her vagina and she did not consent to the penetration. She begged the appellant to stop. Additionally, forensic evidence retrieved from BJ's vaginal walls sperm which matched the appellant's DNA. Accordingly, we conclude that the evidence was sufficient to support the appellant's conviction on count five.

### 2. JJ

As to JJ, the appellant was found guilty on count one of especially aggravated kidnapping, on count three of aggravated spousal rape, and on count eight of assault.[9] Turning first to count one, we note that especially aggravated kidnapping is defined as false imprisonment accomplished with a deadly weapon or any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-305(a)(1) (2003). False imprisonment is the knowing removal or confinement of another unlawfully so as to interfere substantially with the other's liberty. See Tenn. Code Ann. § 39-13-302(a) (2003).

---

[8] The appellant was charged with aggravated rape with a weapon on both counts three and five; however, the jury found him guilty of the lesser-included offenses of rape. The appellant was also charged on count one with especially aggravated kidnapping, and on counts two and four with aggravated rape by causing bodily injury. The appellant was found not guilty of these offenses. Additionally, the judgment of conviction on count three indicates that counts six and seven, which charged the appellant with aggravated rape after binding BJ to the bed, were merged into his conviction for count three. However, we note that the record indicates that the jury neglected to enter a verdict on counts six or seven. Accordingly, the trial court entered verdicts of not guilty on those counts.

[9] The appellant was found not guilty on count four of spousal rape and on count seven of assault. Additionally, the judgment of conviction for count one reflects that counts 2, 5, and 6, which counts relate to the kidnapping of JJ, were merged into the conviction for count one. Again, we note that the appellant has raised no issues regarding the assault conviction.

In the instant case, JJ testified that the appellant, while brandishing a cloth-wrapped object, instructed her to get into his vehicle. While driving to his house, the appellant kept the object in his hand. When they arrived at the residence, the appellant repeatedly threatened to kill JJ. Additionally, upon leaving the residence, the appellant took the wrapped object in the vehicle with him. As they were making various stops, the appellant, who was still in control of the wrapped object, warned JJ not to say anything to anyone or he would "do everyone in." When the appellant and JJ got to JJ's mother's house, JJ asked him not to bring the object into the house. The appellant replied that he would never take such an object around children. JJ testified that she believed the wrapped object to be a gun. We conclude that this evidence is sufficient to support the appellant's conviction for especially aggravated kidnapping.

Finally, as to count three, aggravated spousal rape is defined as the unlawful sexual penetration of one spouse by the other where the defendant knowingly engaged in conduct that was especially cruel, vile and inhumane to the victim during the commission of the offense and is armed with a weapon or any article used or fashioned in a manner to lead the victim to reasonably believe it to be a weapon. Tenn. Code Ann. § 39-13-507(c)(1)(A) and (C) (2003). There is no dispute that the appellant and JJ were married at the time of this offense. Additionally, JJ testified that she did not consent to sexual relations with the appellant. Moreover, we conclude that the appellant's intense and prolonged beating of JJ constituted "especially cruel, vile and inhumane" treatment. Finally, although JJ did not testify that the appellant brandished a weapon during the rape itself, she testified that the appellant possessed an object she believed to be a weapon when he abducted her. The appellant brought the object to the house, and JJ did not know where the appellant placed it. "While not in his actual possession while he raped the victim, it cannot be argued that [the appellant] lacked control over the [weapon] during the event." State v. Moore, 703 S.W.2d 183, 186 (Tenn. Crim. App. 1985); see also State v. James E. Winston, No. 01C01-9302-CR-00069, 1994 WL 390425, at *3 (Tenn. Crim. App. at Nashville, July 28, 1994) ("It is sufficient if the weapon is present and available at all material times."). Accordingly, we conclude that this proof is sufficient to sustain the jury's guilty verdict on this offense.

### III. Conclusion

Finding no reversible error, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE